# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**BRENTLINGER ENTERPRISES**
**D/B/A MAG VOLVO OF DUBLIN,**

       **Plaintiff,**

   **v.**                          **Case No.: 2:14–CV–360**
                                             **JUDGE SMITH**
                                             **Magistrate Judge Jolson**

**VOLVO CARS OF NORTH AMERICA, LLC,**

       **Defendant.**

## <u>OPINION AND ORDER</u>

This matter is before the Court upon Plaintiff Brentlinger Enterprises, d/b/a MAG Volvo of Dublin's ("Brentlinger") Motion for Partial Summary Judgment (Doc. 34). Also pending is Defendant Volvo Cars of North America, LLC's ("Volvo") Motion for Summary Judgment (Doc. 35). Brentlinger opposed Volvo's Motion (Doc. 38) and replied in support of its Motion (Doc. 41). Volvo opposed Brentlinger's Motion (Doc. 40) and replied in support of its own Motion (Doc. 42). These matters are now ripe for review. For the following reasons, the Court **DENIES** Brentlinger's Motion and **GRANTS** Volvo's Motion.

## I.    BACKGROUND

This lawsuit arises out of the business relationship between Brentlinger, Brentlinger's Volvo dealership ("MAG Volvo"), and Volvo. Specifically, Brentlinger challenges a program of bonus payments to Volvo dealers called the "Facility Investment Initiative" ("FII"). Brentlinger contends that MAG Volvo's classification within the FII and the operation of the FII violates numerous state and federal statutes.

The parties dispute the history between Brentlinger and Volvo as it relates to MAG Volvo's place within the FII and thus, a short history of the business relationship is necessary. Brentlinger is an Ohio automobile dealer who sells and services Volvo vehicles under a 2007 agreement with Volvo (the "Dealer Agreement"). Brentlinger also includes franchises which sell, among other brands, Porsche, Audi, Volkswagen, Ferrari, BMW, and Saab vehicles. (Doc. 34-1, Brentlinger Aff. at ¶¶ 2–4). Volvo is a Delaware corporation who makes and distributes Volvo vehicles. (Doc. 1, Compl. at 6). The Dealer Agreement arose when Brentlinger purchased a Volvo franchise from Segna Volvo in 2007. (Doc. 34-1, Brentlinger Aff. at ¶ 5).

Volvo's approval of the sale required Brentlinger to operate a stand-alone Volvo dealership and required that MAG Volvo comply with a Volvo design standards program called Volvo Next Face. (Doc. 34-28, Volvo Conditional Approval of Sale). Brentlinger later agreed with Volvo to move MAG Volvo to Brentlinger's Dublin, Ohio campus on Perimeter Loop Drive. (Doc. 34-1, Brentlinger Aff. at ¶ 6). Although Brentlinger initially pledged to build a standalone building for MAG Volvo, Volvo later approved a modified plan in which Brentlinger would include MAG Volvo as part of another building on the Brentlinger campus. (*Id.*). MAG Volvo's new location was part of a four story expansion of an existing building at the Brentlinger Campus. (*Id.*). Although Volvo agreed to allow Brentlinger to move MAG Volvo to the Brentlinger campus, it still required MAG Volvo to comply with Volvo Next Face. (*Id.* at ¶ 8). In May 2010, Volvo sent a letter to Brentlinger stating:

> [T]he exterior plans for the Volvo expansion do not meet our requirements for Volvo Next Face design. Should we in the future have compensation or margin programs tied specifically to Volvo Next Face facility standards, your exterior facility plans as submitted may not be in compliance and therefore may not meet eligibility. However, the interior plan for the Volvo expansion is in compliance with the current Volvo Next Face requirements.

(Doc. 34-7, Volvo May 3, 2010 Ltr. To MAG Volvo).  However, Volvo ultimately excused Brentlinger from complying with Volvo Next Face when it became clear that compliance at that time was not practicable due to the zoning requirements of the City of Dublin.  (Doc. 34-1, Brentlinger Aff. at ¶ 15).

In 2013, Volvo created an incentive program called the Volvo Performance and Growth Strategy ("VP&GS") which awarded different bonuses to dealerships based on the dealership's classification into one of four categories.  (*See* Doc. 34-12, VP&GS Guide).  Each category was based on the type of facility of each dealership.  (*Id.* at 3–5).  The highest tier was "Exclusive/Metro" followed by "Dedicated," "Shared," and "Universal."  (*Id.*).  Following an assessment by Volvo, MAG Volvo's only Volvo competitor in Columbus, Byers Volvo ("Byers"), was designated "Exclusive" and MAG Volvo was designated as "Shared."  (Doc. 34-8, MAG Volvo Assessment; Doc. 34-9, Byers Assessment; Doc. 34-13, July 19, 2013 Volvo Ltr. to Brentlinger).  Volvo never implemented VP&GS for reasons irrelevant to this case but instead, replaced VP&GS with the a bridge program for the last few months of 2013.  (Doc. 45-4, Neu Dep. at 40)  In 2014, Volvo replaced the bridge program with the FII.

The FII used classification tiers similar to the VP&GS tiers titled "VNF Exclusive," "VNF Customer Facing Dedicated," "VNF Customer Facing Shared," and "Universal/Non-branded."  (Doc. 34-16, FII Guide, PAGEID# 432).  Because the standards for each tier did not change, Byers again received a higher classification, "VNF Exclusive," while MAG Volvo received "VNF Customer Facing Shared."  (*See* Doc. 34-12, VP&GS Guide; Doc. 34-16, FII Guide).  These designations are not without consequence under the FII, as the bonus payments for car sales are directly linked to a dealership's classification.  (Doc. 34-16, FII Guide, PAGEID# 432).  A "VNF Exclusive" dealership receives $500 per qualified car sale while a

"VNF Customer Facing Shared" dealership receives $250 per car.  (*Id.*).  However, the classification system in the FII reaches beyond the payments provided when a dealer sells a new Volvo.  Volvo's XC90 first came out in 2014 and are high-in-demand models.  Volvo sent out an "XC90 Demonstrator, Pre-Sell, and Allocation Policy" ("Allocation Policy") on October 14, 2014 which noted that Exclusive dealers would receive "a 35% override on all allocations" while Customer Facing Shared dealers such as MAG Volvo would receive a 20% override on allocations.  (Doc. 34-17, Allocation Policy at 5).  Additionally, Exclusive dealers received two XC90 demonstrator vehicles while MAG Volvo received only one demonstrator XC90.  (*Id.* at 2).

Brentlinger brought this suit alleging that the Allocation Policy and the FII violate the Ohio Motor Vehicle Franchise Act ("OMVFA") codified at Ohio Revised Code 4517.59, *et seq.*, the Robinson-Patman Act ("RPA") codified at 15 U.S.C. 13, *et seq.*, and the Automobile Dealer's Day in Court Act ("ADDCA") codified at 15 U.S.C. § 1222, *et seq.*  Summary judgment motions were filed by both parties and the case is now ripe for review.

## II.    STANDARD OF REVIEW

Both parties moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient

evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id.*

That the parties have filed cross-motions for summary judgment does not alter the Court's standard of review. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions."). Thus, in reviewing cross-motions for summary judgment, the Court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### III.    DISCUSSION

Brentlinger moved for partial summary judgment on its Fourth, Fifth, Sixth, and Eighth claims.  Volvo moved for summary judgment as to all of Brentlinger's claims.  The Court will first address the price discrimination claims by Brentlinger as the parties spend the majority of the briefing on those claims then will move to the remaining claims.

### A.    Price Discrimination Claims

Brentlinger brings price discrimination claims under two statutes: Ohio Revised Code sections 4517.59(A)(8), 4517.59(B), and section 13 of the RPA.  Both parties moved for summary judgment on Brentlinger claims under sections (A)(8) and (B) of the OMVFA and Volvo moved for summary judgment on the RPA claims.

Ohio Revised Code section 4517.59(A)(8) makes it illegal for any dealer to:

> [f]ail or refuse to make equally available to its same line-make franchisees all motor vehicles, motor vehicle parts, or other products manufactured for that line-make at the same actual price, or to utilize any device including, but not limited to, sales promotion plans or programs that result in such lesser actual price . . . .

The only limitation to this prohibition is that "incentive programs or other discounts" which "are reasonably available to all franchisees in this state on a proportionately equal basis and are based on the sale of individual vehicles and not increased for meeting a performance standard unless the standard is reasonable considering all existing circumstances," are legal.  *Id.*  Additionally, Ohio also makes it unlawful for a dealer to "discriminate among the franchisor's dealers in any program that provides assistance to the franchisor's dealers, including internet listings, sales leads, warranty policy adjustments, marketing programs, and dealer recognition programs." Ohio Rev. Code § 4517.59(B).  It is not clear if FII is a "dealer recognition program" or if it is a "sales promotion plan or program" because those terms are undefined in the Ohio statute.  The FII seems to fall into both categories when using the traditional meanings of the words of "dealer

recognition program" and "sales promotion plan or program." The FII recognizes a dealer for the dealer's exclusivity by putting the dealer in a certain category. However, it is also a sales promotion plan or program because it provides an incentive to dealers to sell more cars and provides a payment which is directly and proportionately related to sales. Accordingly, the Court finds that the FII must comply with both Ohio Revised Code sections 4517.59(A)(8) and (B).

Similarly, under the RPA, it is:

> unlawful for any person . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

15 U.S.C. § 13(a). Although not codified in the statute, a "functionally availability" defense to the RPA has emerged from the case law surrounding the RPA. The functional availability defense is nothing more than an attack on "two essential elements of a § 13(a) claim." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 866 (6th Cir. 2007). Those two elements are "either no price discrimination has occurred, or that the discrimination is not the proximate cause of the injury." *Shreve Equip., Inc. v. Clay Equip. Corp.*, 650 F.2d 101, 105 (6th Cir. 1981). The reasoning behind the defense is that "[i]f the lower prices afforded its competitor were equally available to the plaintiff, any discrimination and competitive advantage suffered by the plaintiff is attributed not to the defendant's program but to the plaintiff's failure to take advantage of its opportunity to receive those prices." *Amer. Tara Corp. v. Int'l Paper Co.*, No. 79C1470, 1981 WL 375752, at *1 (N.D. Ill. July 30, 1981).

Brentlinger argues that there is no functional availability defense to a claim under Ohio Revised Code section 4517.59(B) because a similar exception only exists in section

4517.59(A)(8).  While Brentlinger is correct that the plain language of section 4517.59(B) does not explicitly contain an exception similar to the functional availability doctrine, "[u]nder the law of Ohio, the plaintiffs must show that their damages are proximately caused by the specific statutory provisions." *Earl Evans Chevrolet, Inc. v. Gen. Motors Corp.*, 74 Ohio App. 3d 266, 280, 598 N.E.2d 1187 (11th Dist. 1991) (citing *Neff Lumber Co. v. First Nat'l Bank of St. Clairsville*, 122 Ohio St. 302, 305, 171 N.E. 327 (Ohio 1930)).  As noted above, the functional availability doctrine arose not as a statutory defense to an RPA claim but an attack on two of the essential elements of an RPA claim—one being proximate cause.  Accordingly, the Court holds that when used as an attack against the element of proximate causation, the functional availability defense is available to a defendant in a claim under Ohio Revised Code section 4517.59(B).

Unfortunately, there is a dearth of case law analyzing Ohio Revised Codes sections 4517.59(A)(8) and (B) and their similarities with the RPA.  Additionally, no case law in Ohio exists to explain the parameters for when a sales promotion plan or program is "reasonably available."  The question for the Court is whether "functional availability" and "reasonably available" are merely different phrases for the same standard or if the standards are practically different.  The Court notes that functional availability requires that a discount or program be both theoretically and factually available to all purchasers.  *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 120 (3d Cir. 1980).  It is difficult to imagine a scenario where a discount is theoretically and factually available to a plaintiff but not reasonably available.  Accordingly, the Court sees no compelling reason why the terms "reasonably available" and "functional availability" should be defined differently.

8

Accordingly, the Court looks to the case law concerning "functional availability" to determine when a program is functionally or reasonably available for the purposes of the RPA and the OMFVA.  The functional availability doctrine arose out of the Supreme Court's decision in *Morton Salt*, in which the Supreme Court actually found a discount program illegal because it was theoretically available to small buyers, but functionally it was "so high that it was impossible for small buyers to obtain the discounts received by large buyers." *R.J. Reynolds*, 477 F.3d at 867 (citing *Morton Salt*, 334 U.S. at 42).  As the court in *R.J. Reynolds* noted, "[c]ourts have refused to find discrimination when the buyer's inability to take advantage of the best discount was within the control of the buyer, such as poor credit, management choices, decisions not to hold inventory, or particular marketing strategies." *Id.* at 861 (collecting cases).

In *R.J. Reynolds*, the plaintiffs were contesting an R.J. Reynolds ("RJR") program which rewarded third party sellers of RJR cigarettes whose sales of RJR cigarettes had the highest market share of the seller's overall cigarette sales. *Id.* at 858.  The plaintiffs were third party sellers whose customers preferred other brands and lower tiers of cigarettes to the RJR brand. *Id.* at 859.  The result was that the plaintiffs had trouble staying in the higher tiers of the RJR plan. *Id.*  In attempting to determine if the RJR market share program was a violation of the RPA, the Court noted that "by definition, an incentive-based program will lead to different outcomes for different purchasers.  Incentives and concessions provide greater benefits to those purchasers who choose to align their own competitive objectives with those of their supplier." *Id.* at 866.

Both Brentlinger and Volvo assert that a New York statute in the Franchised Motor Vehicle Dealer Act ("FMVDA") is nearly identical to the OMVFA section at issue in this case.  Specifically, the FMVDA states that it is unlawful for a manufacturer:

> to sell or offer to sell any new motor vehicle to any franchised motor vehicle dealer at a lower actual price therefor than the actual price offered to any other

> franchised motor vehicle dealer for the same model vehicle similarly equipped or
> to utilize any device including, but not limited to, sales promotion plans or
> programs which result in such lesser actual price . . . This paragraph shall not be
> construed to prevent the offering of incentive programs or other discounts
> provided such incentives or discounts are reasonably available to all franchised
> motor vehicle dealers in this state on a proportionately equal basis."

Vehicle and Traffic Law § 463(2)(g). While mostly similar, the exception to the OMVFA

contains an additional qualifier, that the program must be "based on the sale of individual

vehicles and not increased for meeting a performance standard unless the standard is reasonable

considering all existing circumstances." Ohio Rev. Code § 4517.59(A)(8).

Both Brentlinger and Volvo cite decisions out of New York courts which each posit are

determinative in this case but the Court does not agree. Volvo cites *The Premier Collection,*

*LLC v. Jaguar Land Rover N. Am., LLC*, a case in which franchisees sought payments which

were dependent on meeting certain building requirements set forth by the franchisor. No. 14–

CV–8329 (S.D.N.Y. June 28, 2015) (Doc. 35-5, Ex. 5 to Def.'s Mot. ("*Premier Collection*")).

The similarities at the outset are notable. The franchisee owned a dealership which contained

two brand lines, Jaguar and Land Rover. *Id.* at 3. The franchisee and franchisor agreed that the

franchisee would build a dealership that would be compatible with the franchisor's design and

branding guidelines. *Id.* For various reasons, the franchisee could not accomplish this goal. *Id.*

at 7–17. Later, the franchisor instituted the Business Builder Program (the "BB Program")

which would pay a bonus of 6 or 7 percent of the manufacturer's suggested retail price

("MSRP") based on a franchisee's compliance with a set of criteria. *Id.* at 17. The BB Program

required that a dealer have "an approved facility or an approved facility plan." *Id.* The plan had

to "meet both capacity requirements and design and image requirements." *Id.* The franchisee

did not have an approved facility or plan and, accordingly, did not receive any BB Program

payments. *Id.* at 18. Although factual similarities exist, the legal similarities are very different.

First, the decision denied a preliminary injunction and was not a final ruling. *Id.* at 20. Furthermore, the holding in the decision was not based on the FMVDA that is similar to Ohio law. *Id.* at 28. In fact, the court noted that the franchisee did not "argue that other dealers are being treated more favorably, nor d[id] they argue that tying BB payments to having approved facilities is improper." *Id.* Those arguments are the precise arguments made before this Court and thus, the holding in this case provides little persuasive value regarding the application of the "functional availability" and "reasonably available" doctrines.

Similarly, Brentlinger's reliance on *Audi of Smithtown, Inc. v. Volkswagen of Am., Inc.*, is equally unpersuasive. 924 N.Y.S.2d 773 (N.Y. Sup. Ct. 2011). *Audi of Smithtown* concerned an incentive program which was found to be illegal under the FMVDA because it treated new dealerships and existing dealerships differently. The program provided monetary bonuses and incentives based on the number of formerly leased vehicles a dealership purchased each quarter. *Id.* at 775. New dealers were automatically placed at the highest level of benefits for three years, regardless of their purchase of formerly leased vehicles. *Id.* A second program run by Audi was also declared illegal because new dealers again received preferential treatment because their benefits were based on the number of pre-owned cars sold, while existing dealers' benefits were based on the number of formerly leased vehicles. *Id.* at 775–76. The court found "[t]here is no manner in which the bonus offered on new automobiles sales under the CPO program to new automobile dealers is proportionately similar to the bonus offered existing dealers." *Id.* at 780. Yet, again, this case's differences are more significant than its similarities. Besides being based on the FMVDA which does not contain the same exception as the relevant Ohio authority, the Audi programs at issue in *Audi of Smithtown* adjusted the requirements for participation in the program based on the age of the dealership, a factor which is completely out of the control of a

11

dealership.  There was no argument by Audi that the program was readily or functionally accessible to the plaintiff because it was impossible for the plaintiff to ever become a new dealer.

Brentlinger argues that the FII payments are not reasonably available to Brentlinger because, "the full benefits under the FII are solely based upon a facility classification that is determined solely by the Defendant."  (Doc. 34, Pl.'s Mot. at 13).  Additionally, Brentlinger argues that in order to fully comply with the FII, the changes would be "material and costly and certain of the zoning requirements from the City of Dublin preclude full compliance with the Defendant's image and exclusivity requirements."  (Doc. 38, Pl.'s Opp. at 12).  As Volvo has alleged that the program is reasonably and functionally available to all franchisees, it is Brentlinger's burden to establish the proximate cause between the damages allegedly caused and the alleged violation.  However, Brentlinger's arguments do not overcome Volvo's allegation that the full FII payments are available to MAG Volvo on the same terms as any other Volvo dealer.

First, an argument that renovations would be costly is not evidence sufficient to overcome a functional availability argument.  Brentlinger claims that "certain non-exclusive Volvo dealers such as MAG Volvo would necessarily have to incur substantially higher costs to qualify for the full FII Bonus."  (Doc. 41, Pl.'s Reply at 3).  But this is simply not the case.  Although Brentlinger may have to incur high costs to become Exclusive, an Exclusive Volvo dealer such as Byers does not just appear overnight.  Rather, Byers fully complied with the Exclusive requirements before Volvo implemented FII, presumably by incurring the substantial costs of which Brentlinger complains.  In *American Tara Corp. v. International Paper Co.*, the court noted that when a plaintiff and the competitor have to make the same decision whether "to suffer competitive injury if their competitors purchased at the lower price rather than assume the

disabilities or risks in the commitment necessary to purchase at the lower price," then the plaintiff's "choice, not [the] defendant's program, [is] responsible for the price discrimination." *Am. Tara Corp. v. Int'l Paper Co.*, No. 79C1470, 1981 WL 375752, at *3 (N.D. Ill. July 30, 1981).

Further, Brentlinger's argument about high costs ignores the potential benefits an Exclusive dealership could garner. For example, in Brentlinger's damage report, Brentlinger estimates that it has been damaged $112,943 in pre-trial damages and that post-trial damages through 2023 will amount to $326,844. (Doc. 34-18, Geckil Report at 14). In total, Brentlinger estimates that it will sustain $439,787 in damages by 2023 if Volvo continues to use the FII. Yet, Brentlinger ignores that the damages calculations also shows the minimum amount Brentlinger would have to gain from becoming Exclusive. But the potential benefits acknowledged by Brentlinger go beyond the lost sales alleged. Brentlinger also alleges that the FII harms MAG Volvo because MAG Volvo receives fewer "high in demand new Volvo models" than Byers and that Byers receives more demonstrator vehicles than MAG Volvo. (Doc. 34, Pl.'s Mot.). Notably, Barry Lester, Brentlinger's General Manager, testified that Brentlinger build a separate Audi dealership because Audi promised more units and "hot product[s]" from Audi if Brentlinger built a new facility. (Doc. 45-3, Lester Dep. at 87–89). Mr. Lester testified that the additional inventory alone paid for the new Audi building. (*Id.*). This admission alone is sufficient to establish that the Exclusive level is reasonably available to Brentlinger because they have already done something similar for another car company.

Second, Brentlinger argues that Dublin zoning laws "preclude Plaintiff from complying with the Volvo design requirements," and that, accordingly, the Exclusive tier is unattainable for MAG Volvo. (Doc. 38, Pl.'s Opp. at 10). However, there is no evidence that Brentlinger has

asked for a zoning variance to comply with FII requirements or rezoning to comply with the Volvo design requirements to become Exclusive.  Although there is evidence that Brentlinger attempted to receive a variance to comply with Volvo Next Face design requirements when it built the current MAG Volvo building, Brentlinger did not receive those variances and built a facility which Brentlinger knew did not comply with Volvo design requirements anyway.  (Doc. 44-3, Parish Dep. at 93, 97–98).  Volvo approved the design of MAG Volvo but Brentlinger has presented no evidence that Volvo deemed MAG Volvo in compliance with Next Face design or the requirements to be Exclusive under FII.  Rather, Volvo excused MAG Volvo's adherence to Next Face as a prerequisite to building a dealership and approved the facility as being allowed to house a Volvo dealership.  There is no evidence that approval has been changed or modified. Rather, Volvo now has standards that exceed what Brentlinger was willing or able to do at the Perimeter Loop location when the building was built.

Further, many of the published decisions in which courts found a program functionally unavailable involved manufacturer programs which were secret or where the requirements were unknown.  *See Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 752 (1st Cir. 1994) (plaintiff was unaware of the program); *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1516–17 (11th Cir. 1989) (defendant had no opportunity to buy the lower-priced item); *Mueller Co. v. F.T.C.*, 323 F.2d 44, 46 (7th Cir. 1963) (program had no objective standards and program requirements were influenced by concern to protect older retailers); *Allied Sales and Serv. Co. v. Global Indus. Tech., Inc.*, No. Civ. A. 97-0017, 2000 WL 726216, at *18 (S.D. Ala. May 1, 2000) (question of fact as to what the program criteria were and if plaintiff knew of the program); *Calumet Breweries, Inc. v. G. Heileman Brewing Co., Inc.*, 951 F. Supp. 749, 754–55 (N.D. Ind. 1994) (program requirements changed at

14

the end of each period to reward favored distributor and only favored distributor received certain inventory).  Based on all of the foregoing, the Court determines that based on the evidence presented by Brentlinger and Brentlinger's admission that Brentlinger built a new building for Audi to receive more cars, the Exclusive designation under the FII is reasonably and functionally available to Brentlinger as a matter of law.  Accordingly, summary judgment in favor of Volvo is **GRANTED** on Brentlinger's Eighth Claim for relief under Ohio Revised Code section 4517.59(B) and Brentlinger's Thirteenth Claim for relief under section 13(a) of the RPA.

Having determined that the FII is functionally available to Brentlinger, the Court must determine if the FII is available on a "proportionately equal basis," is based on the sales of cars, and is increased only for a reasonable performance standard.  There is no real dispute that the FII distributes money on the basis of the number of cars sold.  For example, if MAG Volvo sold zero Volvos in a given year, it would receive zero FII payments.  However, as Brentlinger argues, the FII is decreased or increased beyond the base level depending on a dealer's exclusivity.  Again, there is no dispute that a program is still legal under § 4517.59(A)(8) even if it provides larger payments to some dealers so long as the increase is based on a reasonable performance standard.  Thus, the only question remaining for the Court is whether the FII constitutes an unreasonable performance standard.  Unfortunately, the OMVFA does not define "performance standard."  The most apt definition of "performance" in Black's Legal Dictionary is "[t]he ability of a corporation to maintain or increase earnings," while "standard" is defined as "[a] model accepted as correct by custom, consent, or authority" or "[a] criterion for measuring acceptability, quality, or accuracy."  *Performance*, Black's Law Dictionary (10th ed. 2014); *Standard*, Black's Law Dictionary (10th ed. 2014).  Combining those two definitions results in a definition of "performance standard" as "a criterion measuring acceptability, quality, or accuracy used to

maintain or increase earnings." Under this definition, there is no doubt that FII is a performance standard. Volvo has provided the Court with evidence that the program is designed to reward dealers who are fully compliant with branding because Volvo saw that branding and the quality of showroom were holding it back in consumer reports. (Doc. 45-4, Neu Dep. at 42). Brentlinger's argument that the standard is unreasonable is the same as the argument that the program is not reasonably available—that it is expensive to comply and that zoning laws prevent compliance. But the reasonableness requirement is arguably even less constrictive than the reasonable availability requirement because it seems possible a performance standard could be reasonable while still not being reasonably available to all dealers in Ohio. Regardless of such a distinction, there is no evidence that the FII is unreasonable and thus Volvo may use the FII to increase payouts that are determined by the sales of cars. Accordingly, the FII is legal under Ohio Revised Code Section 4517.59(A)(8) and summary judgment is **GRANTED** to Volvo on Brentlinger's Fourth Claim.

## B.    Constructive Termination Claim under Ohio Revised Code § 4517.54(A)

Volvo also moved for summary judgment on Brentlinger's First Claim for relief under Ohio Revised Code section 4517.54(A) which requires that any termination of a franchise be done with good cause. Brentlinger's claim rests on the allegation Volvo's use of the FII amounts to a constructive termination because the FII "will result in significant and substantial damages to be sustained by MAG Volvo, including the destruction of MAG Volvo's business." (Doc. 1, Compl. at ¶ 49). Volvo argues that a franchisee "cannot claim constructive termination while continuing to accept the benefits of the franchise agreement." (Doc. 35, Volvo Mot. at 14–15). However, for the same reasons listed above, functional availability remains a bar to the element of proximate cause in Brentlinger's prima facie case. *See* discussion *infra* at part III.A. Accordingly, because the Court holds that FII is functionally available to Brentlinger,

Brentlinger cannot show that FII will proximately cause the destruction of MAG Volvo's business such that it constitutes a constructive termination.  Summary judgment on Brentlinger's First Claim for relief is **GRANTED** in favor of Volvo.

**C.    Good Faith Claims under Ohio Revised Code § 4517.59(A)(1) and Ohio Common Law**

Volvo also moved for summary judgment on Brentlinger's Second and Eleventh Claims for relief.  Brentlinger's Second Claim for relief arises under Ohio Revised Code section 4517.59(A)(1) which states that a franchisor must act in good faith when acting "under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise . . . ."  Brentlinger's Eleventh Claim for relief alleges a breach of the duty of good faith and fair dealing under Ohio common law.  The Court will address these two claims together.  *See Transamerica Servs. Tech.*, *Supply, Inc. v. Gen. Motors Corp.*, 7th Dist. Jefferson No. 02 JE 48, 2004–Ohio–560 (discussing both OMVFA and common law claims without distinction).  Volvo alleges that it has "legitimate commercial reasons to support branded and exclusive Volvo facilities."  (Doc. 35, Def.'s Mot. at 16).  Brentlinger argues that Volvo's use of the FII constitutes a failure to act in good faith because it requires dealers "to become Exclusive or be left behind to suffer adverse economic consequences arising from the disparity in the amount of incentive payments . . . ."  (Doc. 38, Pl.'s Opp. at 22).

"Good faith" as defined in Ohio Revised Code section 4517.01(BB) is "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade . . . including, but not limited to, the duty to act in a fair and equitable manner so as to guarantee freedom from coercion, intimidation, or threats of coercion or intimidation . . . ."  "Coerce" is defined in Ohio Revised Code section 4517.01(CC) as "to

compel or attempt to compel by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse consequences."

In the absence of Ohio Supreme Court guidance, the Sixth Circuit has determined that the OMVFA "forbids manufacturers only from treating their dealers in 'commercially unjustifiable' ways." *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 631 F. App'x 271, 273 (6th Cir. 2015) ("*Franklin Park III*"[1]) (quoting *Jim White Agency Co. v. Nissan Motor Corp. in U.S.A.*, 126 F.3d 832, 834 (6th Cir. 1997) (internal quotation omitted)). Although Brentlinger argues that Volvo "failed to offer any evidence to support the justification behind the FII and its Exclusivity requirements," it is not Volvo's burden to show that the FII is commercially justifiable. Rather, once Volvo has contested Brentlinger's claim, it is Brentlinger's burden to provide evidence that the FII is commercially unjustifiable. Brentlinger has not met this burden. Brentlinger has not provided any evidence that the FII is unjustifiable commercially. Rather, Brentlinger admits that Volvo had an initial benchmark study performed for the FII or its predecessor and ultimately concludes that the practical effect of the FII is to drive small disfavored dealers out of business. But there is testimony that only 20% of Volvo's American dealers are Exclusive and fully branded. (Doc. 45-4, Neu Dep. at 63). Brentlinger does not deny this fact. No reasonable jury could find that Volvo intended to drive 80% of its dealers out of business by providing an incentive for new branding based on the available evidence.

In fact, as Brentlinger admits, the evidence submitted by Volvo discloses that Volvo "identified a gap to remaining competitive in the luxury brand market" in the 2013 J.D. Powers

---

[1] The Court will cite three separate decisions arising from the dispute between Franklin Park Lincoln Mercury and Ford in the Northern District of Ohio and will refer to them in chronological order: *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, No. 3:09–CV–792, 2011 WL 5361738 (N.D. Ohio Oct. 31, 2011) ("*Franklin Park I*"), aff'd, 530 F. App'x 542 (6th Cir. 2013) ("*Franklin Park II*"); *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 631 F. App'x 271, 273 (6th Cir. 2015) ("*Franklin Park III*").

report.  (Doc. 38, Pl.'s Opp. at 22).  In fact, it is undisputed that the J.D. Power report shows that Volvo had a -5.8% gap between it and other luxury competitive brands concerning the appearance of its facilities.  (Doc. 35-1, Neu Aff. at Ex. B.).  Mr. Neu also testified that the purpose of the VP&GS bridge program was based on the "discrepancy versus our competition and that [] discrepancy was that the customer experience based upon facility being the biggest gap needed to be improved and that the branding and the focus was important to the customers." (Doc. 45-4, Neu Dep. at 42).  Further, the FII program was motivated by "the fact that we had a gap to our competition when it came to our image and typically within our facilities and we need to look at how we would improve that image in branding . . . ." (*Id.* at 63).  The Court finds that as a matter of law, an undisputed 5.8% difference in customer satisfaction regarding appearance is a sufficient business justification to begin a program which supports those who already have made the investment in new facilities and rewards dealers who choose to make a new investment in their facilities consistent with Volvo's branding decisions.  Accordingly, the Court cannot find that Volvo breached its duty of good faith under common law or the OMVFA.  Volvo's Motion for Summary Judgment as to Brentlinger's Second and Eleventh Claims for relief is **GRANTED**.

### D.      Coercion Claims under Ohio Revised Code §§ 4517.59(A)(6) and 4517.59(A)(23)

Volvo next seeks summary judgment on Brentlinger's claims of coercion in violation of Ohio Revised Code sections 4517.59(A)(6) and (A)(23).  Volvo argues that there is no coercion inherent in the FII because the FII only asks MAG to "decide whether it is economically more beneficial for it to make facility changes and receive higher support payments, or not to do so and save the cost of changing its facilities." (Doc. 35, Def.'s Mot. at 16).  Brentlinger argues that the FII is designed to compel dealers to become exclusive but that the standard required by Volvo is "simply unattainable" for most dealers.  (Doc. 38, Pl.'s Opp. at 24).

Under the OMVFA, a dealer may not ". . . employ any coercive techniques for any other purposes such as obtaining franchisee participation in contests, 'giveaways,' or other sales devices . . . ." Ohio Rev. Code § 4517.59(A)(6). Also relevant to this case is Ohio Revised Code section 4517.59(A)(23) which prohibits a franchisor from coercing a franchisee "to change location of the dealership, or to make any substantial alterations to the dealership premises or facilities, when to do so would be unreasonable, or without written estimation of a sufficient supply of new motor vehicles so as to justify the location change or alterations, in light of the current market and economic conditions." "'Coerce' means to compel or attempt to compel by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse consequences. Coerce does not mean to argue, urge, recommend, or persuade." Ohio Rev. Code § 4517.01(BB). Similar to the OMVFA's price discrimination proscription, no published court case has examined the OMVFA coercion prohibition in any context, let alone whether a facility support bonus payment is coercive.

Again, in the absence of applicable law, both parties point to cases in other districts which they allege support their arguments. Brentlinger cites *Subaru of Am., Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons* in which a Pennsylvania court held Subaru failed to act in good faith when the franchisor threatened the franchisee with termination if the dealership was not moved. 842 A.2d 1003, 1017 (Pa. Commw. Ct. 2004). Subaru ultimately gave the franchisee three options "move [the dealership], sell to someone who would locate there, or face termination." *Id.* at 1017. Additionally, evidence showed Subaru attempted to force the franchisee to sign an addendum to the contract which would have required the franchisee to move the dealership. *Id.* It was this specific act which ran afoul of Pennsylvania's relevant law which stated that it was unlawful for a dealer to "coerce or attempt to coerce any new vehicle

dealer in this Commonwealth to . . . [e]nter into any agreement with the manufacturer or to do any other act prejudicial to the new vehicle dealer by threatening to terminate or not renew a franchise or any contractual agreement existing between the dealer and the manufacturer or distributor . . . ." *Id.* (quoting 63 P.S. § 818.12(a)(4)).  The Court does not find this case persuasive on the question of whether the use of the FII is coercive because the facts alleged and ultimately proven in *Subaru* clearly showed that Subaru only offered three options, two of which were the ultimate form of coercion, which was termination of the relationship.  Those facts do not exist in this case.  Cited by both parties, *Miller Auto. Corp. v. Jaguar Land Rover N. Am., LLC*, 2010 U.S. Dist. LEXIS 81654, at *5 n.3 (D. Conn. Aug. 11, 2010) is also dissimilar to the case at bar.  The dictum cited by Brentlinger does not mention coercion and as Volvo points out, there was no claim for coercion in *Miller*, only bad faith and contract claims.

The Court recognizes that line between and "incentive" and "coercion" is thin as an incentive, by definition, is designed to induce a person to do that which the person offering the incentive wishes done.  In the context of Sherman Anti-trust Law cases, courts have required a threat of a meaningful event upon non-compliance to find coercion.  *See, e.g.*, *Bender v. Southland Corp.*, 749 F.2d 1205, 1213 (6th Cir. 1984) (collecting cases showing meaningful events can include termination of a franchise, threatening to distort inventory audits to create shortages, and threatening to open a competing franchise nearby).  The Court does not believe that the FII crosses the line from an incentive to coercion because although Brentlinger and other similarly situated dealers may elect to make the changes to become exclusive, the statute itself contemplates compulsion by threat or lack of good faith.  There is no evidence in the record that any threat was made by Volvo to Brentlinger or any other non-Exclusive dealer and the Court has already found the there was no lack of good faith in the use of the FII.  Ultimately, the FII

provides a .6% of MSRP reward and an additional allocation of certain cars to those dealers who have already invested in dealership remodeling and brand alignment over Brentlinger. The Court finds that such a reward is not coercive as a matter of law. Accordingly, summary judgment is **GRANTED** in favor of Volvo on Brentlinger's Third and Sixth Claims for relief

### E.    Predatory Practice Claims Under Ohio Revised Code § 4517.59(A)(15)

Brentlinger's next claim concerns Ohio Revised Code sections 4517.59(A)(15) which prohibits a dealer from "[e]ngag[ing] in any predatory practice or discriminat[ing] against any new motor vehicle dealer . . . as compared to a same line-make franchisee, with regard to motor vehicle allocation, . . . dealership facility requirements, or dealer capitalization requirements." Volvo argues the FII is not a "dealership facility requirement" and thus, section 4517.59(A)(15) is not applicable in this case. Further, Volvo argues that there is no evidence Volvo has discriminated against Brentlinger, the FII is not a predatory practice, and that Brentlinger's claim for relief asks the Court to require Volvo to discriminate in Brentlinger's favor. Brentlinger argues that the evidence is clear that Volvo discriminates in its allocation of XC90's against MAG Volvo and others. The Court notes that the Complaint did not explicitly set forth a claim based on the Allocation Policy and that Brentlinger specifically removed the words "motor vehicle allocation" when quoting the statute. (*See* Doc. 1, Compl. at ¶ 83). However, the Court assumes *arguendo* that the Complaint states two causes of action under section 4517.59(A)(15): (1) that the FII is either a predatory practice or discrimination dealership regarding facility requirements; and (2) that the Allocation Policy is a predatory practice or discrimination regarding vehicle allocations.

Discrimination and predatory practice are not defined in the statute and nothing in the statute clarifies the terms any further. In analyzing this statute, the court in *Franklin Park I* used the standard that "predatory practice or discrimination [i]s a 'sacrificing of present revenue with

the aim of driving a competitor out of the market . . . .'"  2011 WL 5361738, at * 5 (quoting *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 20–21 (Del. Ch. 1992) (analyzing nearly identical provision)).  The Court agrees that "a manufacturer is not predatory if it 'acts in good faith and with good cause . . . .'"  *Id.* (quoting *Saccucci Auto Grp., Inc. v. Am. Honda Motor Co., Inc.*, 2009 U.S. Dist. LEXIS 122015, *21 (D.R.I.2009) (internal quotations omitted)).  In this case, there is simply no evidence that Volvo is using the FII or the Allocation Policy to drive Brentlinger out of business or for any reason other than Volvo's own business judgment.  Accordingly, summary judgment in favor of Volvo is **GRANTED** on Brentlinger's Fifth Claim for relief.

## F.    Claims under Ohio Revised Code Section 4517.59(A)(25)

Brentlinger's Seventh Claim for relief relies on section 4517.59(A)(25) of the OMVFA. Volvo argues that summary judgment is appropriate because Volvo has not required Brentlinger to provide an exclusive facility, but rather, that Volvo "made exclusivity the criterion for receiving a portion of the FII support payments."  (Doc. 35, Def.'s Mot. at 17–18).  Brentlinger argues that the coercive effect of the FII is to require new facilities.

Section (A)(25) of the OMVFA prohibits a franchisor from "Unreasonably requir[ing] a franchisee to establish or maintain exclusive sales facilities . . . unless such exclusivity is reasonable and otherwise justified by reasonable business considerations . . . ."  In this case there is no evidence that the FII is a requirement that would trigger the reasonableness analysis in (A)(25) and Brentlinger presents no argument other than coercion, which the Court has already denied.  *See infra* section III.D.  Accordingly, summary judgment to Volvo is **GRANTED** as to Brentlinger's Seventh Claim for relief.

23

**G.      Claims under the ADDCA, 15 U.S.C. § 1221**

Brentlinger's Ninth Claim for relief alleges a breach of the requirement of good faith in the ADDCA codified at 15 U.S.C. § 1222.  Brentlinger again argues that Volvo's use of the FII is a constructive termination of the franchise agreement while Volvo argues that Brentlinger has presented no evidence to satisfy the ADDCA's specialized definition of good faith.

The ADDCA allows a dealer to bring a claim when a manufacturer fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . . ."  15 U.S.C. § 1222.  "Good faith" is defined as "the duty . . . to act in a fair and equitable manner . . . so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party."  15 U.S.C. § 1221(e).  The Court has already found the FII does not constitute coercion and there is no evidence that Volvo intimidated or threatened to intimidate Brentlinger.  *See infra* at section III.D.  Accordingly the Court **GRANTS** summary judgment to Volvo on Brentlinger's Ninth Claim for relief under the ADDCA.

**H.      Breach of Fiduciary Duty**

Brentlinger's final claim is a common law breach of fiduciary duty claim.  Volvo argues that there is no statutory or contractual basis sufficient to support a fiduciary relationship. Brentlinger maintains that this is the rare instance of a fiduciary relationship between franchisor and franchisee because MAG Volvo is entirely reliant on parts and inventory from Volvo, MAG Volvo must receive approval for significant business decisions, MAG Volvo's employees must meet Volvo training and learning requirements, and MAG Volvo must submit monthly financial reports on Volvo's standard forms.

Ohio courts have noted that "[a] fiduciary relationship does not exist between a franchisor and a franchisee in the absence of a statute expressly creating such fiduciary

24

relationship or, in the alternative, absent an understanding, held by both parties to the subject agreement, that a special trust and confidence has been reposed by the franchisee in the franchisor." *Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.*, 100 Ohio App. 3d 111, 130, 652 N.E.2d 218 (8th Dist. 1994). It is undisputed that there is no statutory basis for a fiduciary relationship in this case and that Dealer Agreement specifically notes that "this Agreement [does not] create any fiduciary or employment relationship between Retailer and the Company." (Doc. 34-5, Agreement at 23).

Instead, Brentlinger argues that the relationship is the rare instance where a fiduciary relationship arises in spite of the general rule that there is no franchise relationship between a franchisor and franchisee. Relying on *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204 (S.D.N.Y. 2007), Brentlinger argues that a fiduciary duty exists because MAG Volvo relies on Volvo for inventory, MAG Volvo must receive approval for significant business decisions, MAG Volvo's employees must meet Volvo training and learning requirements, and MAG Volvo must submit monthly financial reports on Volvo's standard forms. In *Manhattan Motorcars*, the Court held that summary judgment was improper on a fiduciary duty claim where the manufacturer required the dealer "to provide reports to [the manufacturer] concerning sales, inventories, customer data, and all information concerning [the dealer]'s business." *Id.* at 219–20. However, in *Franklin Park*, the Sixth Circuit Court of Appeals found that merely sharing sensitive business information such as a balance sheet and profitability numbers is insufficient to create a fiduciary relationship where the dealer maintains control of human resources decisions, customer information, and advertising. *Franklin Park II*, 530 F. App'x at 548 (6th Cir. 2013).

The Court finds that no fiduciary relationship was created in this case.  First, that MAG Volvo is reliant on Volvo for parts and inventory is exactly the sort of control one would expect in a dealer-franchise relationship, not a rare exception.  Further, Volvo's approval of significant business decisions such as the sale of the dealership is also well within the bounds of a normal franchise relationship because the Ohio Revised Code specifically contemplates such a level of control.  *See* Ohio Rev. Code § 4517.57(C) (setting forth burdens of proof on appeal of a franchisor's refusal to approve a sale or transfer of a franchisee's controlling interest).  Although Brentlinger contends Volvo's control goes beyond the circumstances in *Manhattan*, the facts in this case do not go beyond what the Sixth Circuit and the Ohio Revised Code have already consider common levels of control in franchise agreements.  Accordingly, Volvo's Motion for Summary Judgment on Brentlinger's Twelfth Claim for relief is **GRANTED**.

## IV.    CONCLUSION

Based on the foregoing, Volvo's Motion for Summary Judgment is **GRANTED** and Brentlinger's' Motion for Summary Judgment is **DENIED**.  The Clerk shall **REMOVE** Documents 34 and 35 from the Court's pending motions list.  The Clerk shall enter final judgment in favor of Volvo and **REMOVE** this case from the Court's pending cases list.

**IT IS SO ORDERED.**

__ */s/ George C. Smith*_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**